IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL ACTION NO.
1:18-CR-95-LMM-LTW

CHRISTOPHER WAYNE JACKSON,

Defendant.

## MAGISTRATE JUDGE'S ORDER AND FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This case is before the court on Defendant Christopher Wayne Jackson's ("Defendant") Motion to Suppress (Doc. 15), First Supplement to Motion to Suppress (Doc. 16), Post-Hearing Supplement to Motion to Suppress (Doc. 23), and Motion for Consideration of Additional Authority on Pending Motion to Suppress (Doc. 30). For the reasons that follow, this Court **RECOMMENDS** that Defendant's Motions to Suppress should be **GRANTED**. (Docs. 15, 16, 23). Defendant's Motion for Consideration of Additional Authority on Pending Motion to Suppress is **GRANTED**. (Doc. 30). Because there are no more motions or other matters to address for Defendant Jackson, the undersigned certifies him ready for trial.

## DEFENDANT'S MOTIONS TO SUPPRESS SEARCH

### I.   BACKGROUND

On March 27, 2018, the Grand Jury charged Defendant with knowingly and intentionally possessing with intent to distribute a detectable amount of cocaine, marijuana, and alprazolam (known as Xanax) in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(c), 841(b)(1)(D), and 841(b)(1)(E)(2) and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(I).  (Doc. 1).  On May 14, 2018, Defendant filed his Motion to Suppress and supplemented his Motion on May 13, 2018.  (Docs. 15, 16).  This Court held an evidentiary hearing on July 20, 2018 (Doc. 22), and Defendant filed a Post-Hearing Supplement to his Motion to Suppress on August 7, 2018 (Doc. 23).  On October 3, 2018, Defendant filed a Reply in support of his Motion (Doc. 29) and then moved on October 24, 2018, to supplement his Reply with additional legal authority (Doc. 30).  Defendant's Motion for Consideration of Additional Authority on Pending Motion to Suppress is **GRANTED**.  (Doc. 30).

In Defendant's Motions to Suppress, he argues that evidence obtained during the search of the 498 Center Hill Avenue and his statements made at the time of the search should be suppressed because (1) there was no search warrant for 498 Center Hill Avenue; (2) the arrest warrant for Ryan Jackson did not justify entry into his residence at 498 Center Hill Avenue because the Government's evidence does not show that Ryan Jackson lived at the residence or that he was at the property; (3) there were no exigent circumstances justifying entry other than those created by the law enforcement officers;

2

(4) the plain view doctrine does not justify entry of the residence and the subsequent search because the officers' presence in the curtilage of the home was unlawful; and (5) the search warrant obtained for the search of 490 Center Hill Avenue did not justify entry into 498 Center Hill Avenue because 498 was not listed on the face of or adequately described with particularity within the warrant.

## I.   FACTUAL BACKGROUND

### A.   Police Attempt to Execute an Arrest Warrant for Defendant's Brother at Defendant's Residence

On August 12, 2015, Officer Kristopher Hutchens, who was employed by the Clayton County Police Department for twenty-three years and assigned to the United States Marshal Southeast Regional Fugitive Task Force for four years, attempted to apprehend fugitive Ryan Jackson. (Tr. 46-47, 50; Gov't Ex. 1). Ryan Jackson was charged with home invasion, armed robbery, false imprisonment, two counts of aggravated assault, burglary, possession of a weapon during a crime, and possession of a firearm by a felon. (Tr. 48, Gov't Ex. 48). Because Ryan Jackson was wanted for home invasion robbery, he was considered to be armed and dangerous. (Tr. 48). Officers had previously tried to arrest Ryan Jackson in May 2015 at an apartment which was believed to be rented by Ryan Jackson's father. (Tr. 48-49).

At some point, Task Force Officer ("TFO") Hutchens received a tip that Ryan was at 498 Center Hill.[1] (Tr. 50). Upon receiving the tip, TFO Hutchens looked up the

---

[1] Although initially within the transcript it appears that police received the tip on August 12, 2015, it becomes clear later within the transcript that was not the case

address and learned that it was occupied by Defendant Christopher Jackson, who used the 498 Center Hill Avenue address on his driver's license and was Ryan Jackson's brother. (Tr. 50, 71). TFO Hutchens did not know whether Ryan Jackson resided there and Ryan Jackson was not been listed in any of the documentation TFO Hutchens could locate for the property. (Tr. 71, 73). Yet, TFO Hutchens thought Ryan Jackson might be at the residence because in his experience, he rarely found fugitives where they sleep. (Tr. 78-79). TFO Hutchens had also viewed social media postings by Ryan Jackson which showed Ryan Jackson on the porch, as well as inside the interior of the home. (Tr. 53).

On the morning of August 12, 2015, TFO Hutchens began conducting surveillance of 498 Center Hill from about thirty-five to forty yards away. (Tr. 51-52). That morning, TFO Hutchens observed someone who he thought met the description for Ryan Jackson, arrive in a car during and enter the residence at 498 Center Hill. (Tr. 52-53, 74). TFO Hutchens did not seek information about the license tag of the car in which the suspect had arrived. (Tr. 74). The arriving suspect had a light complexion, tattoos, was about 6 feet, 4 or 5 inches tall and appeared to weigh approximately 230 or 240 pounds. (Tr. 52, 93). The description of Ryan Jackson within the arrest warrant indicated that Ryan was 6 feet, 4 inches, and approximately 225 pounds, African-American, with brown eyes and black hair. (Tr. 52-53, Gov't Ex. 1). In the

---

because TFO Hutchens conducted surveillance of the residence prior to August 12, 2015. (Tr. 50-51 (explaining that TFO Hutchens spent a few hours each day surveilling the property prior to August 12, 2015)).

4

photograph the Government had on file, Ryan Jackson appeared to be an African-American male with short hair and light-skin.  (Tr. 48, 53;  Gov't's Ex. 2).

After seeing who he believed to be suspect Ryan Jackson, TFO Hutchens requested assistance from other Marshals to meet him at a location close to 498 Center Hill so that he could brief them and then return to the house to arrest Ryan Jackson.  (Tr. 54, 72-73 (explaining that TFO Hutchens called for a team to "hit the house" because he saw the person resembling Ryan Jackson at the house that morning).  TFO Hutchens left his surveillance post for approximately forty-five minutes and then returned with a group of sworn U.S. Marshals.  (Tr. 54-55).  TFO Hutchens testified that he could not have another officer replace him to continue surveillance during that forty-five minute period because the street from which he was observing is small and there was no way to get another person to take his place without being seen.  (Tr. 81).  TFO Hutchens felt he could not risk someone watching, seeing another car come in there, and Ryan taking off.  (Tr. 81-82).

Following the briefing, approximately ten Marshals arrived at 498 Center Hill Avenue.  (Tr. 82).  Although there were cars still in the driveway at the time the police arrived, TFO Hutchens does not recall whether the car the suspect had arrived in remained at the residence.  (Tr. 76-77).  TFO Hutchens states that multiple cars came and went from the residence during his period of surveillance.  (Tr. 77).

The Marshals placed a perimeter around the house to make sure no one jumped out of the windows and ran.  (Tr. 55).  The entry team, consisting of seven or eight

5

officers, climbed the stairs at the front entry of 498 Center Hill Avenue with TFO Hutchens. (Tr. 55). About ten minutes after their arrival, the group of officers knocked and announced their presence. (Tr. 76). Because the front door was recessed several feet and only one officer could fit at the entry, TFO Hutchens knocked on the side of the house close to the front door. TFO Hutchens states that the officers "identified [themselves] as police and requested someone to come and open the door." (Tr. 56).

Defendant, who had similar skin tone as Ryan Jackson, opened the door. (Tr. 56-58). TFO Hutchens thought that the person could be Ryan Jackson, but had a feeling that it was not Ryan Jackson when he saw Defendant's dreadlocks because Ryan Jackson had short hair in all of the photos TFO Hutchens had seen. (Tr. 56-58, 68-70). Nevertheless, TFO Hutchens still thought Ryan Jackson was inside because he had information that Ryan Jackson sometimes went to the residence, Ryan Jackson's brother (Defendant) claimed the address on his driver's license, Ryan Jackson had posted photos of himself at 498 Center Hill on social media, and the person he saw enter the home earlier matched the description for Ryan Jackson. (Tr. 71-73, 78).

Defendant stood in the middle of the doorway, but slammed the door less than two seconds later. (Tr. 58, 99). TFO Hutchens testified that at that time, he smelled marijuana.[2] (Tr. 58). TFO Hutchens states that after Defendant closed the door, his

---

[2] While TFO Hutchens and other officers indicated that they smelled marijuana when Defendant opened the door, this Court notes that the absence of a discussion about the smell of marijuana in the police reports and in the search warrant application. (Gov't's Exs. 5-6; Def.'s Ex. 10).

initial thoughts were that Ryan Jackson was in the house and that he was collecting weapons to engage the officers, to barricade himself, or to hide in other parts of the house. (Tr. 59). Thus, TFO Hutchens was concerned for the safety of the officers. (Tr. 59).

### B.   The Officers Ram the Door and Perform a Security Sweep of the Residence

Approximately nine minutes after the officers knocked on the door and announced their presence, the officers breached the front door with a ram. (Tr. 59, 67, 77-78). TFO Hutchens states that the officers could see into the residence and observed multiple people "running left, right, [and] all over the house." (Tr. 59). The officers then called to the interior, "Hey, this is the police, come out to us." (Tr. 59). Several of the occupants filed out of the home where the police made contact with them on the porch. (Tr. 60). Defendant eventually came outside. (Tr. 60). Each of the occupants were secured with handcuffs away from the front porch. (Tr. 62). The officers never saw the individual who TFO Hutchens thought met the description of Ryan Jackson. (Tr. 68).

After TFO Hutchens reached the point where he believed that no other individuals would be leaving the house, he decided that the officers should enter the residence and perform a security sweep. (Tr. 85-86). TFO Hutchens testified that because of Defendant's reaction when he opened the door, the smell of narcotics emanating from the residence, the presence of the weapons systems in an apartment where law enforcement officers previously tried to arrest Ryan Jackson, and all of the issues police

7

had at the prior attempt to arrest Jackson, he believed that the officers needed to enter the house to clear it. (Tr. 61, 93). Additionally, TFO Hutchens was concerned that because of the amount of time that had elapsed between the officers arriving at the residence, knocking, and actually putting their feet inside the door, Ryan Jackson would have had plenty of time to "barricade up, collect these weapons, [and] could be waiting on [the officers]." (Tr. 93). TFO Hutchens also testified that the officers entered the residence because he was there for a fugitive that he believed to be inside. (Tr. 81).

Several minutes after the officers breached the door, the entry team conducted the security sweep. (Tr. 60, 80). As part of the security sweep, the officers, with their weapons drawn, looked for people in the residence anywhere in which a body could fit. (Tr. 61-62). Once the house was secure, the officers holstered their weapons. (Tr. 62). While performing the security sweep, the officers observed multiple firearms laying around the residence. (Tr. 50).

Task Force Officer Joshua Mauney, who was also assigned to the United States Marshal Fugitive Task Force pursuing Ryan Jackson on August 12, 2015, testified that he went to 498 Center Hill Avenue with the team to arrest Ryan Jackson. (Tr. 97-98). After Defendant slammed the door in the officers' faces, TFO Mauney became concerned that Defendant was trying to hide Ryan Jackson and that he was trying to give Ryan Jackson time to escape or to barricade himself. (Tr. 99). TFO Mauney testified that before Defendant closed the door on the officers, TFO Mauney smelled marijuana. (Tr. 100). TFO Mauney also testified that he could still smell marijuana after he entered

8

the residence. (Tr. 100). While conducting the search, he observed guns and drugs in plain view inside the residence. (Tr. 101). TFO Mauney admits that he did not enter 498 Center Hill Avenue because he smelled marijuana, but rather because he was pursuing a fugitive. (Tr. 106).

**C.   Law Enforcement Officers Obtain a Warrant for a Search of 498 Center Hill Avenue**

TFOs Hutchens and Mauney were not involved with the paperwork to obtain a warrant. (Tr. 89). Investigator O'Hare of the United States Marshal Service contacted Detective David Pickering of the Atlanta Police Department to seek assistance in obtaining a warrant for the search of the residence. (Tr. 120-22). Investigator O'Hare told Detective Pickering that the house was located on the 400 block of Center Hill, that the exterior of the house was blue, and that the color of the steps for the house was red. (Tr. 122-23). Investigator O'Hare also told Detective Pickering that the reason for the search warrant was because officers observed marijuana in plain view in three rooms. (Tr. 145). Investigator O'Hare did not mention the marijuana smell to Detective Pickering. (Tr. 145).

The affidavit and application for a search warrant initially described the address to be searched as 490 Center Hill Street NW, 30318. (Def.'s Ex. 14, at 000007). One line below, it described the location to be searched as a blue single-story dwelling with red wooden stairs leading to the front door on 490 Center Hill Avenue. (Def.'s Ex. 14, at 000007). In the affidavit and application, it was noted that during the search of the residence for Ryan Jackson, the officers discovered "marijuana in plain view in three

9

rooms" and approximately twelve types of firearms inside the residence.  (Gov't's Ex. 6).  The officers sought authorization for the search of Defendant's residence for marijuana, weapons, and other evidence of narcotics possession or distribution. (Gov't's Ex. 6).

The Judge signed the search warrant at 4:45 p.m. and Detective Pickering arrived at the scene approximately fifteen or twenty minutes later to execute the search warrant. (Tr. 150).  The warrant described the location to be searched in exactly the same way it was described in the affidavit and application, including the description as being a blue house with red front steps and the discrepancy between 490 Center Hill Street on one line and 490 Center Hill Avenue on the next.  (Def.'s Ex. 15, at 000002).

Detective Pickering states that when he arrived at the scene for purposes of executing the search warrant, officers directed him to a blue house with the red steps, on 498 Center Hill Avenue.  (Tr. 64, 127, Gov't's Ex. 4).  Detective Pickering testified that he did not realize the last digit of the house number was incorrect on the warrant until after executed the search warrant at the blue house.[3]  (Tr. 125, 164).  Detective Pickering states that prior to August 12, 2015, he had never been to Defendant's neighborhood and that mail for 490 Center Hill was found in the mailbox outside 498 Center Hill.  (Tr. 125, 130).  Detective Pickering also points out that 490 Center Hill did

_____

[3] TFO Hutchens never doubted that the street address was 498 Center Hill Avenue and never thought that the address was 490 Center Hill Avenue.  (Tr. 84). TFO Hutchens, however, was not involved in obtaining the search warrant.  (Tr. 84-85).

10

not meet the physical description of the exterior and the color of the stairs that he described in his search warrant because it was beige with tan bricks and it was not blue. (Tr. 127-28).

On the search warrant return, which was a pre-made form, Detective Pickering indicated that he "searched the premises particularly described in [the] search warrant" and left the search warrant "in a conspicuous place on the premises particularly described in the [s]earch [w]arrant." (Tr. 153-54; Def.'s Ex. 16, at 000013). Detective Pickering testified that it was not his intent to mislead the court with respect to where he had executed the search warrant. (Tr. 163-64). On a Supplemental Offense Report, dated August 13, 2015, Detective Pickering indicated that the address on the warrant was incorrect and that the actual address was 498 Center Hill Avenue. (Tr. 126, Def.'s Ex. 10, at 000036). Detective Pickering also noted that the house was particularly described on the search warrant as a single story dwelling with a blue exterior and stained red wooden stairs leading to the front door and that there was no other residence meeting that description. (Def.'s Ex. 10, at 000036).

Detective Pickering testified that he could smell the marijuana when he was conducting the search. (Tr. 167-68). Law enforcement officers found approximately four pounds of marijuana during their search. (Tr. 166).

**D.    Officer Mark Olson Performed a Search of the Residence and Interviewed Defendant at the Scene**

Officer Mark Olson of the Atlanta Police Department ("APD") interviewed Defendant during daylight hours on August 12, 2015, inside Defendant's kitchen. (Tr.

11

4-6, 17, 24).  The interview was videotaped and during the course of the interview, it is apparent that other people and a police dog were present.  (Gov't's Ex. 11; Tr. 9, 24). Prior to the interview, Officer Olson advised Defendant of his <u>Miranda</u> rights, and Defendant agreed to speak with him.  (Tr. 8-10).  Officer Olson, consistent with what was depicted on the video, testified that he did not threaten Defendant, strike him, beat him, or promise him leniency and that no one had their weapons drawn on Defendant during the interview.  (Tr. 8-9).

During the interview, Officer Olson asked Defendant to tell him "about the marijuana and the guns [Officer Olson] found in [Defendant's] bedroom."  (Tr. 11; Gov't's Ex. 11).  Defendant admitted that the guns and marijuana belonged to him.  (Tr. 10-11).  Officer Olson also asked Defendant about other contraband found in the home and often told Defendant the location where officers found the contraband.  (Gov't's Ex. 11).  Defendant continued to admit that the contraband belonged to him.  (<u>Id.</u>).  When Officer Olson asked Defendant about a Glock that Officer Olson found "in the other bedroom that wasn't [Defendant's]," Defendant advised Officer Olson that when he initially answered the door for the officers, the officers were at the door with guns pointing at him.  (Tr. 11-12; Gov't's Ex. 11).  Defendant stated that he shut the door in order to remove the Glock from his person so as not to incite the police at the door.  (Tr. 11-12; Gov't's Ex. 11).

Officer Olson also participated in a search of the residence.  (Tr. 13).  Officer Olson initially arrived at the scene to "look at the house," but does not recall whether

12

he waited until he obtained the search warrant to enter the house. (Tr. 26-27). Officer Olson admits that his entry occurred after the Marshals had already made entry into the home to perform the protective sweep. (Tr. 26-27 (indicating that he does not recall if he entered the house before the officers obtained a search warrant)). Officer Olson testified that prior to entering the home, he could smell marijuana outside the house. (Tr. 14, 36).

At some point, Officer Olson documented a walk through of the home on video. (Tr. 18). During such a walk through, officers usually document everything they find in plain view and record how the house looked. (Tr. 18; Gov't Ex. 9). Officer Olson does not recall whether he had a warrant at the time. (Tr. 25-27). It was documented on the walk through that law enforcement officers found firearms, marijuana, baggies, a shotgun, an AK-47 style rifle, as well as electronic scales in the home. (Tr. 16-17). Officer Olson admits that he never saw the contraband inside the house until after he was inside the house; he did not view the contraband from outside the windows. (Tr. 35-36).

Tiana Lee, who was detained at the residence on Center Hill Avenue on August 12, 2015, testified that she did not smell marijuana either while she was inside the residence or detained outside the residence. (Tr. 113-14). Lee, testified that at the time of her arrest, she was dating Defendant and had visited the house four or five times. (Tr. 115-17). Lee states that she had never seen or smelled anyone smoke marijuana inside the residence at any time and she had not seen any scales or firearms within the

13

residence. (Tr. 117). Lee, further testified that when she went to the residence, she would go into Defendant's bedroom and did not wander around the house. (Tr. 117).

## II.   LEGAL ANALYSIS

Defendant argues the initial entry into his residence at 498 Center Hill Avenue in order to locate his brother was not permitted under Steagald v. United States, 451 U.S. 204 (1981) or Payton v. New York, 445 U.S. 573 (1980) because the law enforcement officers did not have a reasonable belief that his brother lived at the premises, that his brother was present at the time, or that exigent circumstances justified the officers' entry. Defendant also contends that the officers had no exigency to enter into the residence even if they smelled marijuana odor because they did not enter because of marijuana odor, they entered to find his brother. Additionally, Defendant argues that any exigency was created by the law enforcement officers who entered the front porch of the residence, making their presence known, instead of obtaining a warrant. Defendant further contends that the search warrant for 490 Center Hill Avenue did not give the officers the authority to enter 498 Center Hill Avenue because the premises at 498 Center Hill Avenue were not described with particularity in the warrant and the warrant created a risk that the officers would search the wrong location.

### A.   It Was Not Lawful for the Officers to Enter Defendant Christopher Jackson's Residence in Order to Execute the Arrest Warrant for His Brother

Under the facts of this case, the undersigned finds that the officers' initial entry into Defendant's residence was not lawful. The Fourth Amendment guarantees "[t]he

14

right of the people to be secure  in their persons, houses, papers, and effects, against unreasonable searches  and  seizures." U.S. Const. amend IV. "The sanctity of a home is afforded special protection under the Fourth Amendment, such that the reasons for upholding warrantless arrests in a public place do not apply to warrantless invasions of the privacy of the home." Bashir v. Rockdale Cty., 445 F.3d 1323, 1327 (11th Cir. 2006).  The Supreme Court decided in Payton v. New York, 445 U.S. 573 (1980), that an arrest warrant based upon probable cause gives law enforcement officers "the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  Id. at 603; United States v. Hollis, 780 F.3d 1064, 1068 (11th Cir. 2015).  When determining whether law enforcement officials may enter a residence "to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling and that the suspect is within the residence at the time of entry." United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995).

The warrantless entry of Defendant's residence at 498 Center Hill Avenue to arrest his brother, Ryan Jackson, was not authorized under Payton, supra, because the officers did not have reason to believe that Ryan Jackson was living there.  When determining whether officers had reason to believe that Ryan Jackson was residing at 498 Center Hill Avenue, common sense facts are analyzed.  United States v. Bellamy, 456 F. App'x 863, 865 (11th Cir. 2012).  The facts within the knowledge of the law

enforcement officers in this case did not warrant a reasonable belief that 498 Center Hill Avenue was Ryan Jackson's residence at the time of entry.  Indeed, it is not apparent that even the officers who were pursuing Ryan Jackson believed that he resided there. (Tr. 71).  Although Ryan Jackson was a fugitive and could have been staying with his brother, Defendant Christopher Jackson, the police officers at the scene readily admit that they did not know whether Ryan Jackson was residing at 498 Center Hill Avenue. (Tr. 71-73 (testimony by TFO Hutchens that he "could not tell you if that was his residence or not, if he was laying his head there or not," that he had "no idea," and admitting that none of the things that he was investigating that led him to that house told him that Ryan Jackson lived there), 105-06 (testimony by TFO Mauney that he thought Ryan Jackson lived at 498 Center Hill Avenue because he took the word of another officer and states that he does not know if Ryan Jackson "lived there or not or if he ever stayed there" and that he has "no idea")).  Furthermore, TFO Hutchens admits that Ryan Jackson was not listed on any of the documentation he could locate for the property. (Tr. 71, 73).  Although TFO Hutchens testified that he had surveilled the residence for more than one day, there is no indication that he had seen Ryan Jackson there on any day other than August 12, 2015.  (Tr. 50-51).  While the officers had viewed social media postings which included pictures of Ryan Jackson at 498 Center Hill avenue, given that his brother resided there, Ryan Jackson's presence at the residence on social media, without more, at most suggests that he was visiting his brother there, and not that he resided there.  Here, the Government presents no evidence that Ryan Jackson was

16

living at the residence, such as bills or mail addressed to him at the house, or neighbors or relatives advising police that he lived there. The surveillance of the residence on other days failed to reveal any evidence that Ryan Jackson even spent the night at Defendant's residence. Indeed, there was no evidence that the alleged tipster indicated that Ryan Jackson was living in the residence. Accordingly, the police did not have a reasonable belief that Ryan Jackson was living in Defendant's home.

Because the officers did not have reason to believe that Ryan Jackson was residing at 498 Center Hill Avenue, without some other justification, the officers could not lawfully enter Defendant's residence for the purpose of arresting his brother. When an officer effectuates an arrest warrant in a third-party's home, the officer may violate the Fourth Amendment rights of the third-party. Hollis, 780 F.3d at 1068 (citing Steagald v. United States, 451 U.S. 204, 212-16 (1981)); O'Rourke v. Hayes, 378 F.3d 1201, 1209 (11th Cir. 2004). The Supreme Court held in Steagald v. United States, 451 U.S. 204 (1981), that a law enforcement officer may not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant unless exigent circumstances are present or consent is given. Id. at 205-06, 213-14. An arrest warrant alone is not sufficient because it creates the potential for abuse; "armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." Bates v. Harvey, 518 F.3d 1233, 1245 (11th Cir. 2008). Thus, "[t]he police bear a heavy burden of proving that the exigent circumstances exception validates a warrantless entry or search of a third party's home

17

to look for a non-resident." Bates, 518 F.3d at 1245.

**B.     The Officers' Actions Were Not Justified by Exigent Circumstances**

The Government argues exigent circumstances justified the officers' entry into 498 Center Hill Avenue without a search warrant because the officers were concerned about the risk of flight and danger to the officers' safety posed by Ryan Jackson, who was a fugitive wanted for violent crimes and considered to be armed and dangerous. Conversely, Defendant contends that the police did not enter the residence due to exigent circumstances; they entered to find Ryan Jackson. To the extent that there were exigent circumstances present, Defendant argues the officers created their own exigency by pounding on the front door. Absent the officers pounding on the door, Defendant further argues, there was no reason to believe that the occupants of the house had been tipped off as to the presence of law enforcement officers, no reason to be concerned for the destruction of evidence, no danger to persons present, or any other circumstances described as exigent. The officers could have retreated, obtained a search warrant, and returned, all without alerting the occupants of the house.

"The exigent circumstances exception to the warrant requirement recognizes a warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." United States v. McCoy, 259 F. App'x 264, 267 (11th Cir. 2007) (citing Bashir, 445 F.3d at 1328); United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir. 2002). "The exigency exception only applies when 'the inevitable delay incident to obtaining a warrant must

18

give way to an urgent need for immediate action.'" United States v. Lynch, 934 F.2d 1226, 1232 (11th Cir. 1991) (citing United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir.1983)).  For the exception to apply, the officer "must have probable cause to believe that exigent circumstances exist," and the reasonableness of that belief is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences."  Smith v. LePage, 834 F.3d 1285, 1293 (11th Cir. 2016) (quoting Roberts v. Spielman, 643 F.3d 899, 905-06 (11th Cir. 2011)); see also United States v. Duhon, 503 F. App'x 874, 877 (11th Cir. 2013) (citing United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002)) ("Underlying the exigent circumstances exception is the notion that 'once presented with an emergency situation, the police must act quickly, based on hurried and incomplete information.'").  "The general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption from the requirement to show the need for it."  United States v. Santa, 236 F.3d 662, 669 (11th Cir. 2000) (citing Chimel v. California, 395 U.S. 752, 762 (1969)); see also McCoy, 259 F. App'x at 267.

The exigent circumstances exception only applies if the police reasonably believe that an emergency situation justifies warrantless action, such as situations involving "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit."  See, e.g., McCoy, 259 F. App'x at 267 (finding exigent circumstances where suspect was believed to be inside

19

apartment, officers viewed chrome revolver on apartment floor, suspect was known to carry weapons and believed to have committed three murders, and vehicle left the scene at a high-rate of speed around the same time that officer yelled gun) (citing Bashir, 445 F.3d at 1328). The following factors may contribute to exigent circumstances: (1) if the suspect is charged with violent offense(s); (2) a reasonable belief that the suspect is armed; (3) a strong reason to believe that the suspect is in the premises being entered; (4) probable cause to believe that the suspect committed the crime; (5) a reasonable belief that the delay could allow for the destruction of essential evidence or the escape of the suspect; (6) a reasonable belief that delay could jeopardize the safety of law enforcement officers or the public; and (7) whether the entry was peaceful. Parker v. Allen, 565 F.3d 1258, 1290 (11th Cir. 2009); United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987).

Applying the aforementioned factors, the Court cannot reach the conclusion that exigent circumstances were present at the time the officers entered the curtilage of Defendant's residence to effectuate the arrest. Although Ryan Jackson was charged with serious violent offenses, the Supreme Court has counseled that exigent circumstances do not exist just because the police have an arrest warrant for a fugitive, even if the fugitive is wanted on serious offenses. Steagald, 451 U.S. at 215; Mincey v. Arizona, 437 U.S. 385, 392 (1978) (explaining that the mere fact that the suspect was believed to have committed a homicide was not enough to give rise to exigent circumstances). Additionally, while there was a possibility that Ryan Jackson was

20

armed, the Government's proof falls short of showing that he was armed at the time he allegedly was at his brother's residence.  Notwithstanding that Ryan Jackson was believed to have been armed during commission of a home invasion and an armed robbery, it had been months since Ryan Jackson had allegedly committed the armed robbery or since the time law enforcement officers attempted to apprehend him at his father's house.  The fact that Ryan Jackson may have utilized a weapon to commit armed robbery does not necessarily lead to the conclusion, without more, that he remained armed when he arrived at the house of his brother more than three months later.  The Government asks the Court to accept that because the law enforcement officers found weapons in Ryan Jackson's father's apartment, that it was likely that they would find weapons at Defendant Jackson's house.  Although the circumstances certainly counseled caution for the officers, the Government did not connect Ryan Jackson or Defendant Jackson to the weapons present at Ryan Jackson's father's apartment.  There is no evidence that Ryan Jackson was living at his father's apartment. TFO Hutchens only states he had seen Ryan Jackson come to his father's apartment twice and leave. (Tr. 49).  When the officers went to Ryan Jackson's father's apartment, Ryan Jackson was not found there. (Tr. 49-50).  In addition, there was no evidence that Ryan Jackson was living in Defendant's home.  Without more, this Court has difficulty accepting the premise that the presence of weapons at Ryan Jackson's father's apartment means there must also have been weapons at Defendant Chris Jackson's house.

Furthermore, this is not a situation where there was any evidence that Ryan

21

Jackson or even Defendant Chris Jackson knew law enforcement officers were surveilling Ryan Jackson or Defendant's home in pursuit of Ryan Jackson that day.  The Eleventh Circuit has repeatedly held that "circumstances are not normally considered exigent where the suspects are unaware of police surveillance" because "in such situations, the officers easily could maintain surveillance until they could make a public arrest or obtain a warrant."  United States v. Hayes, 334 F. App'x 222, 225 (11th Cir. 2009); see also United States v. Lockett, 533 F. App'x 957, 964 (11th Cir. 2013); Santa, 236 F.3d at 669-70.  The Eleventh Circuit has reasoned that "[s]uspects who are inside their homes and unaware of their pending arrests generally have no reason immediately to flee" and without more "there is little reason for them to endanger the lives of themselves or others."  United States v. Lynch, 934 F.2d 1226, 1232-33 (11th Cir. 1991) (citing United States v. George, 883 F.2d 1407, 1413-14 (9th Cir. 1989)); Napier v. Fowler, No. 09-60684-CIV-UNGARO, 2009 WL 10699620, at *1, 7-9 (S.D. Fla. Nov. 30, 2009) (even though armed robbery suspect believed to be in third-party's residence was wanted for a grave offense, exigent circumstances did not justify the search for suspect because more than twenty-four hours had passed since the robbery and officers were not in hot pursuit, officers did not have reason to believe that the suspect was armed because they had recovered inoperable firearm from scene of the robbery, and there was no reason to believe that suspect was alerted to officer's presence).

Here, the Government does not show that prior to the point the officers entered the curtilage of Defendant's home, the occupants of the home would have had any

reason to know that the officers were pursuing Ryan Jackson or that Ryan Jackson, to the extent he may have been in the home, would have any reason to flee.  There is no indication that the occupants of the residence observed TFO Hutchens surveilling them. The evidence is clear that up to the point in which TFO Hutchens entered Defendant's property with a team of law enforcement officers, TFO Hutchens was careful to not tip any occupants of the home to his presence or that he was law enforcement.  TFO Hutchens' testimony shows that he was cautious about being detected and that he actually left his surveillance post near the home to meet with the other officers who would be on the entry team at another location out of view.  (Tr. 54-55, 81-82).  TFO Hutchens did not request that another officer replace him at the surveillance post because the street was small and he would not risk someone watching and seeing another car coming in there.  (Tr. 54-55, 81-82).

Nevertheless, there was no showing by the Government that TFO Hutchens could not have maintained surveillance with the other officers stationed on standby nearby while obtaining a warrant.  See Lynch, 934 F.2d at 1232 n.4 ("We will not hold that the warrantless search of an individual's home may be justified by the police's inability to maintain effective surveillance, particularly when no exigency has been established. Such a holding would run counter to all established fourth amendment precedent."); Santa, 236 F.3d at 669 (rejecting government's argument that officers needed to enter defendant's apartment immediately to prevent the destruction of evidence and defendant's escape because the occupants of the apartment were unaware they were

23

under police investigation, the surveilling DEA agents were all in unmarked cars and they had done nothing to disclose their presence, and agents had no cause to believe that confidential informant had tipped off suspects); United States v. Hudson, 102 F. App'x 127, 136 (10th Cir. 2004) (rejecting conclusion that exigent circumstances justified warrantless entry into third party's home to execute felony arrest warrant for suspect who was armed, had eluded capture for a week, and might escape again because there was no emergency or immediate need to enter home to protect life or property nor proof that the police had an immediate need to enter to protect themselves or their safety). The Government omits to explain why TFO Hutchens could not have briefed the other officers via telephone, while other officers secured a search warrant for Ryan Jackson instead of meeting offsite for forty-five minutes. Indeed, TFO Hutchens testified that prior to that point, he had been maintaining surveillance for a few hours each day. (Tr. 51). Additionally, the search took place in the middle of the day on a week day; thus, it stands to reason that access to court personnel to obtain a warrant for the search of the residence would be possible and could occur quickly. Notably, after the initial protective sweep and search for Ryan Jackson, the officers did utilize a second set of officers to obtain the search warrant and they did so through an electronic procedure where law enforcement officers complete a search warrant application form electronically from Public Safety Headquarters and "zap it over to a judge who is in a different location." (Tr. 142-43, 147-48). Thus, the officers could not rely on the exigent circumstances exception and at that point, could not lawfully enter the property

24

or the home in order to execute the warrant for Ryan Jackson.  <u>Steagald v. United States</u>, 451 U.S. 204, 205-06 (1981).

**C.**   **<u>The Officers' Presence on the Property Was Not Justified as a Knock and Talk</u>**

The Government argues, citing <u>Kentucky v. King</u>, 563 U.S. 452 (2011),  that the officers lawfully knocked on Defendant's door and announced their presence, and contends that in the <u>King</u> case, the Supreme Court rejected the argument that a warrantless search is invalid where law enforcement created the exigency by either knocking on the door of a residence and announcing their presence or by engaging in conduct that would prompt a reaction from the occupants.  The Court disagrees that the Supreme Court's decision in <u>King</u> is as far-reaching as the Government has argued.

In <u>King</u>, the police set up a controlled buy of crack cocaine outside an apartment complex and Officer Gibbons observed the deal take place from an unmarked car in a nearby parking lot.  563 U.S. at 456.  Officer Gibbons radioed uniformed officers to move in on the suspect and advised the officers that the suspect was moving quickly towards the breezeway of an apartment building.  <u>Id.</u>  Officer Gibbons told the officers to hurry before the suspect entered an apartment.  <u>Id.</u>  As pursuing officers entered the breezeway, they heard a door shut and detected a strong odor of burnt marijuana.  <u>Id.</u> At the end of the breezeway, officers saw two apartments, one on the left and one on the right, and were unsure which apartment the suspect had entered.  <u>Id.</u>  Because they smelled marijuana smoke emanating from the apartment on the left, they approached the door of the apartment.  <u>Id.</u>  One of the officers who approached the door testified that

25

the officers banged on the door "as loud as they could" and announced, "This is the police" or "Police, police, police." Id. As soon as the officers banged on the door, they could hear people moving inside and sounds as if things were also being moved inside. Id. According to one officer on the scene, the noises led the officers to believe that drug-related evidence was about to be destroyed. Id. The officers then announced that they were going to make entry inside the apartment, kicked in the door, and entered the apartment. Id. After entry, the officers found respondent Hollis King, his girlfriend, and a guest who was smoking marijuana. Id. at 456-57. The officers performed a protective sweep, during which they saw marijuana and powder cocaine in plain view. Id. at 457. The police also found the suspected drug dealer who was the target of their investigation. Id. at 457.

The Supreme Court observed that under the exigent circumstances doctrine, several exigencies may justify a warrantless search of a home, including "the need to prevent imminent destruction of evidence," which was at issue in that case. Id. at 460. The Court then observed that lower courts had developed the police-created exigency doctrine as an exception to the exigent circumstances rule. Id. at 461. Under the doctrine, courts, recognizing that the reason evidence is destroyed will usually be fear that the evidence will fall into the hands of law enforcement, often held that the police-created exigency doctrine requires something more than simple causation but differed on the test to be applied. Id. at 461-62. The Court then reasoned that the answer to the question presented in the case was that given that the touchstone of when warrantless

26

searches are permitted is reasonableness, when police may have created the exigency "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense." Id. at 462. The Court concluded "[w]here, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." Id. at 462. In support, the Court noted that it had followed a similar approach in other cases and that for instance, "law enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." Id. at 463 (citing Horton v. California, 496 U.S. 128, 136-140 (1990)).

The Supreme Court then rejected some approaches previously advanced in the lower courts. The Supreme Court rejected the notion that a warrantless search justified by exigent circumstances becomes invalid because it was reasonably foreseeable that investigative tactics employed by the police would create the exigent circumstances. Id. at 464-65. The Court also noted that courts applying this test have invalidated warrantless home searches on the ground that it was reasonably foreseeable that police officers, by knocking on the door and announcing their presence, would lead a drug suspect to destroy evidence. Id. at 464-65. The Court reasoned that such a rule would not be appropriate because it would be too difficult for officers in the field, who must make split-second judgments under rapidly-evolving circumstances, to apply. King, 563

27

U.S. at 464-65.

Likewise, the Supreme Court has rejected the approach that an otherwise valid exigent circumstances search is invalid when law enforcement officers deliberately created the exigent circumstances with the bad faith intent to avoid the warrant requirement because the approach is fundamentally inconsistent with Fourth Amendment jurisprudence requiring examination of whether the circumstances objectively justify the law enforcement action. King, 563 U.S. at 464-65.  Furthermore, the fact that the law enforcement officers have obtained probable cause to search and time to obtain a warrant and instead, choose to knock on the door and speak with an occupant or obtain consent for a search, does not invalidate the search because to do so is a legitimate law enforcement strategy. Id. at 466-67.  The Court considered such a strategy legitimate because a short and simple conversation may obviate the need to apply for and execute a warrant, or to obtain consent may be simpler, faster, and less burdensome than applying for a warrant.  King, 563 U.S. at 466-67.

The Supreme Court also rejected the argument that law enforcement impermissibly create an exigency when they engage in conduct that would cause a reasonable person to believe that entry is imminent and inevitable.  King, 563 U.S. at 468.  Applying that reasoning, the Court opined that police officers have good reason to announce their presence and knock loudly or forcefully on the door, such as to alert occupants that someone was at the door, to provide information as to who it is at the door so that occupants can evaluate whether to open the door, or to in some cases, to

28

reassure citizens that it is the police at the door.  <u>King</u>, 563 U.S. at 468.

The Court then returned to the principle that the exigent circumstances rule still applies when the police do not gain entry into a premises by means of an actual or threatened violation of the Fourth Amendment.  <u>Id.</u>  The Court then reasoned that "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do," that such conduct was entirely consistent with the Fourth Amendment, and that the court was not aware of any "other evidence that might show that the officers either violated the Fourth Amendment or threatened to do so (for example, by announcing that they would break down the door if the occupants did not open the door voluntarily)."  <u>Id.</u>

Thus, the question in instant case becomes whether the police either violated the Fourth Amendment or threatened to do so prior to the point when they entered Defendant's home.  The Government argues that the law enforcement officers did nothing improper when they approached Defendant's residence to knock and announce their presence and that "they are not responsible for his subsequent actions that gave rise to the exigent circumstances." (Gov't Br. 15).  This Court disagrees.

The Government's activity at Defendant's door could have been lawful if it had been a valid knock and talk.  "A knock and talk is a consensual encounter between police who seek to gather information and a civilian, which takes place at the civilian's home."  <u>Young v. Borders</u>, 850 F.3d 1274, 1295 (11th Cir. 2017).  Absent express orders from the occupant(s) of the residence, the police "are allowed to knock on a

29

residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may."  United States v. Lara-Mondragon, 516 F. App'x 771, 772-73 (11th Cir. 2013); United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006) (explaining that "[a]bsent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man's 'castle,' with the honest intent of asking question of the occupant thereof"); see also Florida v. Jardines, 569 U.S. 1, 8 (2013) (explaining that "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do"); King, 563 U.S. at 471-72 (explaining that it was lawful for officers to approach an apartment door and bang on the door "as loud as they could" and announce "this is the police" or "police, police, police").  In this Court's view, however, the law enforcement officers' actions at the front door were not an attempt to knock and talk to the occupants of a residence like a normal invitee to the residence.  Here, based on this Court's evaluation of the facts, the law enforcement officers entered the property with the intent to search for and arrest their fugitive, not to talk.  They violated the Fourth Amendment when they exceeded the behavior of a normal invitee and utilized their official authority as police officers to demand that Defendant open the door and relied on a show of force to raid the home.

Supreme Court and Eleventh Circuit case law following King make it clear, that knocking at the front door of a home is not always a lawful police intrusion into the

curtilage[4] of the home and the manner in which police enter the curtilage and their reason for the entry into the curtilage matters.  In <u>Florida v. Jardines</u>, 569 U.S. 1 (2013), the Supreme Court evaluated whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home was a lawful search, and thus turned to "the question of whether it was accomplished through an unlicensed physical intrusion." <u>Id.</u> at 3, 8.  The Court then reasoned that the answer to this question depends on whether the officers had an implied license to enter the porch, which in turn depends on the purpose for which they entered.  <u>Jardines</u>, 569 U.S. at 9.  The Court explained that based upon social custom, "the knocker on a front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds" and thus, "[t]his implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." <u>Jardines</u>, 569 U.S. at 8.  The Court further explained, citing <u>King</u>, supra, that a "police not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." <u>Jardines</u>, 569 U.S. at 8 (citing <u>King</u>, 563 U.S. at 469-70).   The Court then reasoned that introducing a trained police dog to explore the area around the home in hopes of

---

    [4] The curtilage of the home is the area "immediately surrounding and associated with the home" and is part of the home itself for Fourth Amendment purposes.  <u>Florida v. Jardines</u>, 569 U.S. 1, 6 (2013).  "This area around the home is intimately linked to the home, both physically and psychologically, and is where privacy expectations are most heightened." <u>Id.</u> at 7 (internal quotation marks omitted) (quoting <u>California v. Ciraolo</u>, 476 U.S. 207, 213 (1986)).

31

discovery incriminating evidence is "something else," that there is no "customary invitation to do that," and that the scope of a license–express or implied–is limited not only to a particular area but also to a specific purpose.  Jardines, 569 U.S. at 9.  The majority of the Court, responding to the criticism that under prior precedent, the subjective intent of the officer is irrelevant, stated that the question before the court is precisely whether the officer's conduct was an objectively reasonable search, which depended on whether the officers had an implied license to enter the porch, which in turn depended on the purpose for which they entered.  Id. at 10.  The Court concluded that under the circumstances, the officers' conduct objectively revealed a purpose to conduct a search, which is not what anyone would have thought the officers as invitees would have customarily had a right to do.  Id.

The Eleventh Circuit opined in United States v. Maxi, 886 F.3d 1318 (11th Cir. 2018), that "[t]he reasoning in Jardines is not limited to the specific facts of bringing a drug-sniffing dog up to the front porch" and "extends to any police intrusion onto curtilage that exceeds the customary license extended to all, whether measured by officers' actions or their intent." Id. at 1327.  While the court acknowledged that police have an owner's implied permission to approach a home to knock and talk because that is no more than any private citizen might do, the court cautioned that the background social norms that invite a visitor to the front door to talk do not invite him there to conduct a search or invite "an armed battalion in the yard to launch a raid." Id.  Thus, the Eleventh Circuit has held that the scope of the knock and talk exception is limited

32

in two respects: (1) "it ceases where an officer's behavior objectively reveals a purpose to conduct a search"; and (2) "the exception is geographically limited to the front door or a minor departure from it." Id. at 1327; see also United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015).

In Maxi, the Eleventh Circuit applied these principles to find that the police's presence in the curtilage of the defendant's home was unlawful. There, an informant had identified the back unit of a duplex as one where guns and drugs would be found, and police began surveilling the property. Id. at 1322. The officers stopped a truck leaving the property and asked the occupants for identification. Id. at 1322. After a search of the truck revealed no contraband, the truck turned back to the duplex. Id. at 1322. The officers decided that they should approach the residence with the occupants of the truck because otherwise the occupants would alert persons inside. Id. at 1322. Thus, five police cars, holding approximately ten officers arrived at the residence and both occupants of the truck were detained. Id. at 1322-23. Four or five of the officers proceeded through a gate and chain-link fence to the door of the back unit of the duplex while the remaining officers surrounded the duplex. Id. at 1322-23. At least one of the officers approached the door with his gun drawn in a low, ready position. Id. at 1323. The officers reached through a security gate to knock on the door, but probably did not announce police. Id. at 1323. One detective testified that after Maxi opened the door, he could see a clear mixing bowl and a white plate containing crack cocaine. Id. Officers ultimately forced open the security gate at the door and arrested Maxi. Id.

33

The Eleventh Circuit held that the officers' presence at the door was not a valid knock and talk because their physical intrusion was not geographically limited to the front door or minor departure from it since they took of tactical positions not just at the front door, but also around the perimeter of the duplex. Id. at 1327. Likewise, the officers' intent in approaching the duplex was not that of an ordinary citizen and that there was no doubt that the officers intended to secure the duplex and detain anyone they found inside. Id. Moreover, given that one officer had his gun drawn in a low, ready position, the encounter was never "intended to be a casual, informational interview" and exceeded the customary social invitation. Id. Thus, the officers did not have a license to enter the curtilage of the duplex. Id.

In this case, the manner in which the officers entered the property and the curtilage of Defendant's home exceeds the customary license given to ordinary citizens to enter the property. The officers clearly entered the property to search for and apprehend Ryan Jackson, rather than talk, and they did not confine their presence on the property to the front door of the residence like a normal invitee. Here, approximately ten marshals arrived at the scene in helmets and tactical gear, guns drawn, and instead of confining their presence to the front door, placed a perimeter around the house. (Tr. 54-55, 82-83; Gov't Ex. 11). Approximately seven or eight were on the front doorstep when TFO Hutchens (who stood behind a shield operator) knocked on the wall. (Tr. 56, 82). Furthermore, it is readily apparent that the law enforcement officers at the door utilized their official authority to persuade someone in the residence to open the door

34

and ultimately used force to gain entry to the residence.  Although TFO Hutchens stated that the officers identified themselves as police and "requested someone to come and open the door," TFO Mauney clarified that typically under the circumstances present in this case that when officers arrive at the door, they will typically say, "Police, come to the door, police, open the door, police with a warrant, open the door."  (Tr. 56, 98).  Indeed, Defendant stated during the interview that when he opened the door, the officers' guns were pointed at him.  Thus, it appears that the officers' behavior at the door was more consistent with a show of authority and force to gain entry and not a mere request for the occupants to come to the door so that they could have a chat.  Thus, in this Court's view, the officers did not simply ask Defendant to come to the door; rather, consistent with TFO Mauney's testimony, the officers demanded it based on their status as law enforcement officers and their attempt to execute a warrant on Ryan Jackson.

It is also clear under the circumstances that the officers always intended to access the property in order to apprehend a dangerous suspect, Ryan Jackson.  TFO Hutchens testified that after he saw someone resembling Ryan Jackson, it "caused [him] to go ahead and call for a team to hit the house" and that the reason he went inside the house was that he "was there for a fugitive and that was it."  (Tr. 72, 81).  TFO Mauney's testimony makes clear that he went to the residence "[t]o arrest and apprehend a fugitive," not to talk at the door.  (Tr. 98).  Based on TFOs Mauney and Hutchens' testimony and the officers' perimeter around the residence while wearing tactical gear,

it is apparent that the law enforcement officers always planned to gain entry to the home to execute the warrant.  Even objectively, the officers' behavior suggests a raid instead of the behavior of a normal invitee.

Because the officers' actions did not qualify as a knock and talk, the officers did not have license to enter the curtilage of the Defendant's home.  Maxi, 886 F.3d at 1327; see also Jardines, 569 U.S. at 9-10.  Thus, the question then becomes whether evidence obtained during the searches that followed the officers' illegal entry into the curtilage of the home as well as Defendant's subsequent statements should be subject to the exclusionary rule and should be suppressed.  Id.

**D.     Evidence Obtained During the Protective Sweep Should Be Excluded**

Because the officers' entry into the curtilage of the home and ultimately, the home itself, violated the Fourth Amendment, the evidence gleaned during the protective sweep should be suppressed.  In order to perform a protective sweep that comports with the requirements of the Fourth Amendment, the officers must first be lawfully within the premises.  United States v. Timmann, 741 F.3d 1170, 1181 (11th Cir. 2013).  Here, however, the officers had no justification for being in the curtilage of the home, they had no justification for demanding that the occupants of the home open the door, and they were not lawfully within the premises for performing a protective sweep.  Timmann, 741 F.3d at 1181-82.

**E.     Evidence Obtained During the Search of the Residence Pursuant to the Search Warrant Should Be Excluded**

Likewise, the evidence obtained during the execution of the search warrant

36

obtained on August 12, 2015, should be suppressed. Where the government makes an initial warrantless entry that violates the Fourth Amendment and then relies on what was seen during that entry to obtain a search warrant, the Court applies a two part test to determine whether evidence seized during the execution of the warrant is discovered independently of the unlawful entry and thus, admissible. United States v. Noriega, 676 F.3d 1252, 1260 (11th Cir. 2012). The first thing that is done is to excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding. Noriega, 676 F.3d at 1260 (citing United States v. Chaves, 169 F.3d 687, 692-93 (11th Cir. 1999)). Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place. Noriega, 676 F.3d at 1261. A fair probability "exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." Noriega, 676 F.3d at 1261 (citing United States v. Lopez, 649 F.3d 1222, 1245 (11th Cir. 2011)).

If the remaining information is enough to support a probable cause finding, the court determines whether the officer's decision to seek the warrant was prompted by what had been seen during the illegal entry. Noriega, 676 F.3d at 1260. To determine whether an officer's decision to seek a warrant is prompted by what he saw during the initial entry, courts ask whether the officer would have sought the warrant even if he had not entered. Noriega, 676 F.3d at 1260-61.

In this case, Detective Pickering sought a warrant for the search of Defendant's residence for marijuana, weapons, and other evidence of narcotics possession or distribution. (Gov't's Ex. 6). To support of the warrant, Detective Pickering submitted an affidavit that explained that while in pursuit of Ryan Jackson, law enforcement officers conducted surveillance on Defendant's residence and ultimately entered it to find Ryan Jackson. (Id.). During the search for Ryan Jackson, officers observed marijuana in plain view in three rooms as well as twelve types of firearms. (Id.). Detective Pickering offered no other support for the notion that marijuana, weapons, or other evidence of narcotics possession or distribution would be found in the home. Thus, when the fruits of the protective sweep are excised from the warrant, there is no probable cause that the aforementioned contraband would be found in the home. Accordingly, the evidence obtained during the search pursuant to the search warrant should be suppressed.

### F. Defendant's Statements During the Interview by Officer Olson Should Be Excluded

Finally, Defendant's statements during the interview with Officer Olson should also be suppressed. Under the "fruit of the poisonous tree doctrine, admissions or confessions that the police induce by confronting a suspect with evidence obtained through an illegal search or seizure must be suppressed." Timmann, 741 F.3d at 1182. The government bears the burden of proving that such admissions or confessions were not obtained as "a direct result of the illegal search." Timmann, 741 F.3d at 1182. "The relevant inquiry examines the extent of the causal connection between the lawless police

38

conduct and the evidence in question." <u>Timmann</u>, 741 F.3d at 1182.  The inquiry "generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." <u>Timmann</u>, 741 F.3d at 1182.  Several factors are considered, including the temporal proximity of the illegal action by law enforcement and the defendant's response, the presence or absence of intervening circumstances, and the purpose and flagrancy of the official misconduct.  <u>Timmann</u>, 741 F.3d at 1183; <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1315 (11th Cir. 2009).

In this case, the temporal proximity of the illegal search and the confession militates in favor suppressing Defendant's statements.  If only a short period of time has passed after the illegal search, a court is more likely to consider statements made as a poisonous fruit of the illegal act.  <u>Lopez-Garcia</u>, 565 F.3d at 1315; <u>United States v. Delancy</u>, 502 F.3d 1297, 1310 (11th Cir. 2007).   Periods of time between two minutes and six hours have been found to be sufficient to meet the temporal proximity factor. <u>Parker v. Allen</u>, 565 F.3d 1258, 1292 (11th Cir. 2009) (explaining that absent significant intervening events, statements given within two to six hours of an arrest have been suppressed); <u>Lopez-Garcia</u>, 565 F.3d at 1315.  Longer intervals of, for instance, four days have been found to weigh in favor of admissibility.  <u>Delancy</u>, 502 F.3d at 1310 (citing <u>Devier v. Zant</u>, 3 F.3d 1445, 1459 (11th Cir. 1993)).  Absolute certainty about how much time has elapsed is not necessary and "the character of the interaction between the law enforcement agents and the defendant is relevant to [the] determination of how temporal proximity affects the underlying analysis." <u>United States v. Smith</u>, 688

39

F.3d 730, 739-40 (11th Cir. 2012). "When an officer's interaction with an individual is highly intrusive, the passage of time is less likely to attenuate the officer's illegal act from the suspect's later consent." Smith, 688 F.3d at 739-40. For instance, where officers unlawfully kicked in the locked front door of an apartment, with their guns drawn, ordered the defendant to lay on the floor and proceeded to handcuff him, and told the defendant that they knew there were drugs in the house and asked him to make it easy on them and just tell them where the drugs were, the officer's interaction was considered intrusive and that the defendant's consent, even if voluntary, did not purge the primary taint of the illegal entry and arrest. Smith, 688 F.3d at 739-41 (citing United States v. Santa, 236 F.3d 662, 666 (11th Cir. 2000)); United States v. Smallwood, No. 1:13-cr-381-1-TCB, 2014 WL 3519195, at *13-14 (N.D. Ga. July 16, 2014).

Here, while the evidence presented to the Court does not include evidence showing the amount of time that elapsed between the illegal searches and Officer Olson's interview, it is apparent that the interview took place the same day Defendant's residence was searched. (Tr. 5). It is also apparent that Officer Olson's interview of Defendant also occurred sometime after Officer Olson searched Defendant's residence, and that Officer Olson, who found contraband during the search, conducted the interview of Defendant in the same kitchen where some contraband was found. (Tr. 11, 13, 17, 18 (indicating that the officers found an AK-47 style rifle, an electronic scale, and marijuana in the kitchen)). In addition, the entry into Defendant's residence was very obtrusive. A large number of officers surrounded the residence and six or seven

40

whom entered Defendant's front porch with at least some of their guns pointed at Defendant and used a battering ram to breach the front door.  While it is true that Officer Olson maintained a conversational tone during the interview and did not make any threats, Defendant remained in custody and in handcuffs.  Although, the record is unclear, the illegal searching of Defendant's residence appears to have continued close in time with the interview.  Officer Olson participated in a walk through with a video camera documenting items found in plain view following the initial entry and security sweep, but perhaps prior to the search stemming from the search warrant.  (Tr. 10, 14-18, 24-25 (explaining that after the marshals conducted their security sweep of the house, one marshal remained inside the house, but when narcotics arrived, the house was cleared and the walk through was done); Gov't's Ex. 9).  Additionally, during the video of Officer Olson's interview of Defendant in the kitchen, the sounds of other officers as well as the excited sounds of a canine unit can be heard in the background.  (Gov't's Ex. 11).  Here, there is no evidence that the passage of time gave Defendant the opportunity to reflect on his predicament such to remove the taint of the unlawful entry, detention, and subsequent searches.  Thus, the temporal proximity factor weighs against the Government.  See, e.g., United States v. Yarbrough, 281 F. Supp. 3d 1225, 1239 (N.D. Ala. 2018) (explaining that where forty-four minutes elapsed from illegal seizure of shotguns and consent to search did not weigh in government's favor because character of interaction between law enforcement agents and defendant was intrusive in that law enforcement officers had detained defendant and his wife and placed them under arrest,

41

the law enforcement officers had just conducted an illegal search of defendant and his wife's house, the officers displayed the guns seized during the illegal search, and the officers threatened to tear up defendant and his wife's home if they did not consent to a search).

The Court also cannot conclude that intervening events or circumstances attenuated the primary illegality. Intervening events or circumstances independent of the primary illegality can so attenuate the causal connection that they dissipate the taint of the unlawful action by law enforcement. United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1982). A voluntary act by a defendant does not necessarily break the causal chain. Bailey, 691 F.2d at 1013. Thus, being advised of Miranda rights does not, by itself, "automatically free the statements from being the fruit of the poisonous tree." Archibald v. Ardovino, No. 7:14-CV-02427-KOB-HGD, 2016 WL 7007563, at *5 (N.D. Ala. Sept. 26, 2016); United States v. Cordova, 829 F. Supp. 2d 1342, 1352 (N.D. Ga. 2011) (citing 6 LaFave, § 11.4(c) at 307 (holding that "it is crystal clear that giving the defendant the Miranda warnings will not break the causal chain between an illegal search and a subsequent confession")); see also Parker, 565 F.3d at 1292 (explaining that the admission of Miranda warnings alone is not considered a significant intervening event); Bailey, 691 F.2d at 1013-14 (explaining that a defendant's voluntary consent to be searched, obtained after the defendant had been illegally arrested and advised of his right to refuse to be searched, will not by itself dissipate the taint of the unlawful arrest).

While the Court accepts that Defendant voluntarily agreed to speak with Officer

42

Olson after Officer Olson read the <u>Miranda</u> warnings to him, the Government has not met its burden of proving that Officer Olson's reading of the <u>Miranda</u> warnings and Defendant's agreement to speak with him dissipated the taint by the illegal entry and subsequent searches. (Tr. 10). Here, after the officers forcefully entered the residence, conducted a security sweep, and after Officer Olson also performed a search of the residence, Officer Olson confronted Defendant during the interview about contraband he found during the course of his search, specifying where each item of contraband was found in the home. (<u>See, e.g.</u>, Tr. 10 (indicating in the transcript of the interview that Officer Olson asked Defendant to "[t]ell [him] about the guns [Officer Olson] found in [Defendant's] bedroom"), 11 (asking Defendant to tell Officer Olson about the Glock "that was found in the other bedroom that wasn't [Defendant's]"), 14-18, 24-25; Gov't's Exs. 9, 11). Thus, the admissions Officer Olson obtained during the interview a direct exploitation of an unlawful search in which Officer Olson had participated. <u>Timmann</u>, 741 F.3d at 1184 (explaining that where officers confronted the defendant with evidence they had obtained through the unlawful search of his apartment in order to elicit his admissions, the admissions were the direct result of the officers' exploitation of the unlawful search and should be suppressed as fruit of the poisonous tree); <u>United States v. Santa</u>, 236 F.3d 662, 686-77 (11th Cir. 2000) (finding that where consent to search came three minutes after DEA agents kicked in defendant's door, entered the apartment, ordered him onto the floor, handcuffed him, and read him <u>Miranda</u> warnings as agents conducted a protective sweep of entire apartment and then asked defendant just to make

43

things easy and tell the agents where the drugs were located and confession ensued, the Miranda warnings without more did not dissipate the taint of an illegal seizure even though the agents' unlawful actions were not flagrant); Cordova, 829 F. Supp. 2d at 1351 (concluding that despite fact that defendant's statements were elicited five days after illegal search and defendant had been advised of his Miranda rights before making statements, because officer exploited his knowledge of illegally seized evidence in such a way that defendant had little choice but to admit his role and offer to cooperate, statements were fruit of the poisonous tree and suppressed); United States v. Acosta, 807 F. Supp. 2d 1154, 1184-85 (N.D. Ga. 2011) (finding absence of sufficient attenuation to purge taint from illegal search even though defendant had been Mirandized before he made statements because waiver of Miranda rights occurred close in time with illegal search of the residence, search may have continued during questioning, and topic of questioning conducted by agent who unlawfully entered residence and obtained consent to search was linked to illegal search); United States v. Marcelino, 736 F. Supp. 2d 1343, 1352 (N.D. Ga. 2010) (concluding that statements made after Miranda warnings were given should be suppressed as fruit of the poisonous tree because they flowed from his illegal detention, search, and arrest and thus, there was an exploitation of the illegality).

Under the last factor, the purpose and flagrancy of the official misconduct, if the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is necessary.  United States v. Delancy, 502

F.3d 1297, 1312 (11th Cir. 2007).  This Court is convinced that the officers' initial entry in the home was done purely in an effort to execute the arrest warrant.  This entry and the actions that followed – the protective sweep, detaining Defendant and questioning him, and searching his home pursuant to the search warrant– while perhaps not flagrant, were done without regard to settled constitutional rights of a third party whose home was entered to execute a warrant for the arrest of another who was not known to live there.  As a result, the constitutional violations compounded.  While this factor does not weigh heavily in favor of suppression, the fact remains that Officer Olson induced Defendant's confession by capitalizing on evidence which was obtained through an illegal entry and searches and thus, this Court concludes that Defendant's statements must be suppressed. Timmann, 741 F.3d at 1184 (where admissions about who owned firearms were elicited following officer's advising the defendant that police had found firearms in the defendant's bedroom, the admissions were the direct result of the officers' exploitation of the unlawful search and were suppressed as the fruit of the poisonous tree); Santa, 236 F.3d at 677-78 (concluding that where there was neither a significant lapse of time nor intervening circumstance which dissipated the effect of the illegality, taint had not been dissipated even though the agents' unlawful conduct was not flagrant).

## **CONCLUSION**

Based on the foregoing, Defendant's Motions to Suppress should be **GRANTED**. (Docs. 15, 16, 23).  Defendant's Motion for Consideration of Additional Authority on

Pending Motion to Suppress is **GRANTED**.  (Doc. 30).  Because there are no more motions or other matters to address for Defendant Jackson, the undersigned certifies him ready for trial.

    **SO ORDERED, REPORTED AND RECOMMENDED** this 10 day of December, 2018.

LINDA T. WALKER

CHIEF UNITED STATES MAGISTRATE JUDGE

46